**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| WATERVALE MARINE CO., LTD., as owner of the M/V AGIOS EMILIANOS, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 12-cv-0105 (KBJ) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

This case presents an issue of first impression regarding the United States Coast Guard's statutory authority to impose non-financial conditions for the release of a foreign-flagged vessel that the agency has detained at a United States port due to suspected violations of federal and international environmental law.  Plaintiffs in this case are the owners and operators of four foreign-flagged merchant vessels that the Coast Guard held at United States ports for investigation of criminal violations and later released, but only after Plaintiffs had each posted a bond and executed a "security agreement" that contained various non-financial conditions.  By their complaint filed on January 23, 2012 (Compl., ECF No. 1), Plaintiffs have brought this action against the Coast Guard and the United States Department of Homeland Security ("DHS") (collectively, "Defendants") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 (2014), challenging the non-financial security agreements that the Coast Guard required them to execute as a condition of their ships' departure clearance on the

ground that the Coast Guard lacked statutory authority to require any such condition prior to releasing the vessels.  (*Id.* ¶¶ 107-114.)

Before this Court at present are Defendants' motion for summary judgment (U.S. Mot. for Summ. J. ("U.S. Mot."), ECF No. 13) and Plaintiffs' cross-motion for summary judgment (Pls.' Cross-Mot. for Summ. J. ("Pls.' Mot."), ECF No. 16). Plaintiffs ask the Court to vacate the security agreements and to enjoin the Coast Guard from demanding anything other than a bond or *financial* surety as a condition of departure clearance in the future.  (Pls.' Resp. in Opp'n to the Defs.' Mot. for Summ. J. & Pls.' Cross-Mot. for Summ. J. ("Pls.' Mem."), ECF No. 16-1, at 40-41.)  Defendants argue that the exercise of the Coast Guard's discretion to require Plaintiffs to execute non-financial security agreements is nonjusticiable, and in any event, the security agreements were entirely proper as a matter of law.  (U.S. Mem. in Supp. of its Mot. for Summ. J. ("U.S. Mem."), ECF No. 13-1, at 2-3.)

This Court has now considered the cross-motions, the oppositions thereto, and several rounds of supplemental briefing.[1]  Because this Court agrees with Defendants that section 1908(e) of Title 33 of the U.S. Code commits entirely to the agency's discretion the matter of when and under what circumstances the Coast Guard may grant departure clearance to a vessel detained under that statute, the Court concludes that the

---

[1] In addition to the summary judgment motions, the parties in this matter have filed notices of supplemental authority and responses thereto.  (*See* Pls.' Suppl. Stmt. of P&A ("Pls.' *Angelex I* Suppl."), ECF No. 24; U.S. Resp. in Opp'n to Pls.' Offer of the *Angelex* Decision as Persuasive Auth. ("U.S. *Angelex I* Resp."), ECF No. 25; U.S. Notice of Filing Suppl. Auth. ("U.S. *Angelex II* Notice"), ECF No. 26; Pls.' Resp. to Defs.' Notice of Suppl. Auth. ("Pls.' *Angelex II* Resp."), ECF No. 27; U.S. Notice of Filing Suppl. Auth. ("U.S. *Monarch Shipping* Notice"), ECF No. 28; Pls.' Resp. to Defs.' Notice of Suppl. Auth. (Pls.' *Monarch Shipping*  Resp."), ECF No. 29.)  This Court also requested additional supplemental briefing on a particular question of law, which the parties briefed in full.  (*See* U.S. Suppl. Br., ECF No. 30; Pls.' Mem. in Resp. to the Court's Minute Order Dated April 25, 2014, Requesting Suppl. Briefing ("Pls.' Suppl. Br."), ECF No. 31; U.S. Reply ("U.S Suppl. Reply"), ECF No. 34; Pls.' Resp. to the Defs.' Suppl. Mem. Dated May 30, 2014 ("Pls.' Suppl. Reply"), ECF No. 35.)

Coast Guard's decision to require the challenged security agreements is nonjusticiable. Therefore, as set forth in the separate order accompanying this opinion, the Defendants' motion for summary judgment will be **GRANTED**, and Plaintiffs' cross-motion for summary judgment will be **DENIED**.

## BACKGROUND FACTS

The underlying facts are not in dispute.  Plaintiffs are the owners and operators of four foreign-flagged oceangoing bulk carriers:  the M/V AGIOS EMILIANOS ("Agios Emilianos"), the M/V STELLAR WIND ("Stellar Wind"), the M/V GAURAV PREM ("Gaurav Prem"), and the M/V POLYNEOS ("Polyneos") (collectively, "Plaintiffs' vessels").  (Compl. ¶¶ 13, 24, 34, 43.)[2]  Plaintiffs' vessels periodically dock at U.S. ports to offload or obtain cargo.  (*See id.* ¶¶ 21, 31, 41, 50; U.S. Mem. at 2, 8-9.)  At various times between April and September of 2011, Coast Guard inspectors boarded Plaintiffs' vessels to investigate alleged violations of the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. §§ 1901-1915 (2014)—alleged violations that whistleblowers on board each ship had reported to Coast Guard authorities. (Compl. ¶¶ 14, 25, 35, 44.)

The Act To Prevent Pollution From Ships

The APPS is a federal statute that implements an international maritime treaty the goal of which is "to achieve the complete elimination of intentional pollution of the marine environment by oil and other harmful substances and the minimization of

---

[2]  Defendants have compiled an administrative record for each vessel, and in this opinion, the administrative record for each vessel will be referred to as AR [name of vessel] [Bates number].  As reflected in the record, Plaintiffs' four vessels each fly the flag of a different country:  the Agios Emilianos is from Cyprus (AR Agios 000066); the Stellar Wind is from Liberia (AR Stellar Wind 000090); the Gaurav Prem is from Panama (AR Gaurav Prem 000047); and the Polyneos is from the Marshall Islands (AR Polyneos at 000091).

accidental discharge of such substances." *See Wilmina Shipping AS v. U.S. Dep't of Homeland Sec.* (*Wilmina Shipping II*), 934 F. Supp. 2d 1, 6 (D.D.C. 2013) (quoting *United States v. Pena*, 684 F.3d 1137, 1142 (11th Cir. 2012)); *see also* 33 U.S.C. § 1901(a)(4).   The treaty, which the United States entered into along with other foreign nations, is called the International Convention for the Prevention of Pollution from Ships and is commonly known as "MARPOL" or the "MARPOL Protocol."   Among MARPOL's provisions are two requirements relevant to the case at bar:   (1) that a vessel may only discharge oily water at sea if special equipment is used to contain most of the oil; and (2) that vessels are required to record all oil transfers and discharges in an oil record book that must be made available for the government to inspect.   *See Wilmina Shipping II*, 934 F. Supp. 2d at 6-7 (citing *United States v. Ionia Mgmt., S.A.*, 555 F.3d 303, 306-07 (2d Cir. 2009)).   Notably, the MARPOL Protocol is not self-executing; therefore, each signatory nation must implement the treaty by establishing rules that, among other things, sanction ships that violate any of MARPOL's provisions. *See id.* at 6.

The United States enacted the APPS in 1980 to implement MARPOL.   The "APPS authorizes the Secretary [of DHS] to administer and enforce MARPOL and to issue regulations to implement the treaty's requirements."   *Id.* at 7 (citing 33 U.S.C. § 1903(a), (c)(1); 33 C.F.R. § 151.01 (2014); *see also United States v. Sanford Ltd.*, 880 F. Supp. 2d 9, 11-12 (D.D.C. 2012).   Under the APPS, "[i]t is unlawful to act in violation of the MARPOL Protocol . . . or the regulations issued thereunder."   33 U.S.C. § 1907(a); *see also id.* § 1908(a) ("A person who knowingly violates the MARPOL Protocol . . . commits a class D felony.").   Among the various activities that constitute a

knowing violation of MARPOL for the purpose of the APPS or its regulations is the keeping or maintaining of a false oil record book. *See id.* § 1908(b)(2); 33 C.F.R. § 151.25 (requiring vessels to maintain oil record books and to monitor and record all oily discharge). Maintaining a false oil record book is a criminal felony and may also give rise to civil liability. *See, e.g.*, *Sanford*, 880 F. Supp. 2d at 11 (individual defendants charged with seven felony counts under the APPS including maintaining a false oil record book); 33 U.S.C. § 1908(b) (setting forth the amount of fines that individuals must pay when found civilly liable for violations of MARPOL).

Under the APPS as well as certain other statutes, the Coast Guard is authorized to board and inspect ships that are docked at ports in the United States in order to detect potential violations of the APPS, MARPOL, and other environmental laws. 33 C.F.R. § 151.23(a); *see also* 14 U.S.C. § 89 (2014) (authorizing Coast Guard officers to board and inspect ships at ports). Pursuant to 46 U.S.C. § 60105(b) (2014), a foreign-flagged ship must obtain departure clearance from Customs and Border Protection ("Customs") before it may depart a U.S. port, and under the APPS, government authorities are required to withhold such clearance for established or suspected APPS violations. *See* 33 U.S.C. § 1908(e). Moreover, federal officials have statutory authority to grant departure clearance for ships previously detained "upon the filing of a bond or other surety satisfactory to the Secretary." *Id.* Specifically, the APPS provides:

> If any ship subject to the MARPOL Protocol . . . is liable for a fine or civil penalty under this section, or if reasonable cause exists to believe that the ship, its owner, operator, or person in charge may be subject to a fine or civil penalty under this section, the Secretary [of DHS] shall refuse or revoke the clearance required by section 60105 of Title 46. *Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary.*

*Id.* (emphasis added).[3]

The Detention And Release Of Plaintiffs' Vessels

Beginning in the spring of 2011, the Coast Guard received various whistleblower complaints alleging that Plaintiffs' vessels had falsified oil record books, and the agency determined that it had reasonable cause to believe that the vessels' crewmembers had violated the APPS.  Accordingly, pursuant to section 1908(e) of the APPS, the Coast Guard ordered that Customs withhold the vessels' departure clearance from ports in New Orleans, Louisiana (Agios Emilianos and Stellar Wind and Polyneos) and in Mobile, Alabama (Gaurav Prem).  (Compl. ¶¶ 16, 27, 37, 46.)  Customs complied with the Coast Guard's order and withheld the vessels' departure clearance.  (*Id.* ¶¶ 17, 28, 38, 47; *see, e.g.*, AR Agios Emilianos 000043 (letter from Customs to Agios Emilianos indicating clearance was being withheld because the vessel was believed to be subject to a fine or penalty).)[4]  The absence of departure clearance prevented Plaintiffs' vessels from leaving the ports and returning to business at sea, a state of affairs that imposed significant costs on the vessel owners.  The costs that resulted directly from the denial of departure clearance included "losing daily charter hire [and]

---

[3] The statute vests discretion to grant clearance with the Secretary of the department in which the Coast Guard operates, which is DHS.  *See Angelex Ltd. v. United States* (*Angelex II*), 723 F.3d 500, 502 (4th Cir. 2013); *Giuseppe Bottiglieri Shipping Co. S.P.A. v. United States*, 843 F. Supp. 2d 1241, 1244 n.4 (S.D. Ala. 2012).  The Secretary of DHS delegates this discretion to the Coast Guard.  33 C.F.R. § 151.07; *see also Angelex Ltd. v. United States* (*Angelex I*), No. 2:13cv237, 2013 WL 1934490, at *7 (E.D. Va. May 8, 2013), *rev'd*, 723 F.3d 500 (4th Cir. 2013).

[4] Customs and the Coast Guard are both divisions of DHS, and Congress apparently intended for these agencies to work together in enforcing international and environmental law with respect to foreign sea-going vessels.  *See* Arnold W. Reitze, Jr., Criminal Enforcement of Pollution Control Laws, 9 Envtl. Law. 1, 19 (Sept. 2002) (noting that "[o]ften, two or more federal agencies[,]" including Customs and the Coast Guard, "jointly work environmental crime investigations"); *see also United States v. Gonzalez*, 688 F. Supp. 658, 665 (D.D.C. 1988) (describing how Customs and the Coast Guard "have long worked together to enforce American laws" based on the legislative history of their governing statutes and their "long mutual relationship").

delaying cargo vital to commerce," and also "costs for wharfage, bunkers for auxiliary power, crew wages and maintenance, provisions, insurance, local agents expenses and port charges[.]"  (Compl. ¶¶ 21, 31, 41, 50.)  Moreover, the vessel owners incurred these additional expenses on top of the threat of significant and substantial breach of contract claims from the charterers of the vessels.  (Pls.' Mem. at 8 & n.22.)

Plaintiffs' ships were held at port subject to the Coast Guard's APPS investigation for a period of time that ranged between a few days and three weeks, depending on the vessel.[5]  At some point during this period of detention, the vessel owners entered into negotiations with the Coast Guard, which sought both the posting of a monetary bond and also the execution of a contract—titled a "Security Agreement"—that imposed various non-financial conditions that the Coast Guard Headquarters in Washington, D.C. had selected.  (Compl. ¶¶ 19, 20, 29, 39, 48.)

One version of the required security agreement is reproduced in the Appendix to this opinion; the terms of that agreement were substantially similar for each of the four vessels.  (*See* AR Agios 000035-42 (reprinted in the Appendix to this opinion) [hereinafter "Appendix"]; AR Gaurav Prem 000024-30; AR Polyneos 000016-23; AR Stellar Wind 000045-54.)  For example, each security agreement required that specific, listed crewmembers "remain within [ ] the jurisdiction" while the Coast Guard's APPS

---

[5] The Coast Guard ordered Customs to revoke the Agios Emilianos's departure clearance on April 27, 2011, and conditional departure clearance was granted on May 7, 2011.  (AR Agios 000031.)  The Coast Guard ordered Customs to revoke the Stellar Wind's departure clearance on September 15, 2011, and conditional departure clearance was granted on September 20, 2011.  (AR Stellar Wind 000022, 000031.)  The Coast Guard ordered Customs to revoke the Gaurav Prem's departure clearance on September 26, 2011, and conditional departure clearance was granted on October 4, 2011.  (AR Gaurav Prem 000021, 000030.)  Finally, the Coast Guard ordered Customs to revoke the Polyneos's departure clearance on October 26, 2011, and conditional departure clearance was granted on November 17, 2011. (AR Polyneos 000013, 000023.)

investigation was pending.  (Appendix § 3.)  Under the terms of the agreement, the

owners and operators of each vessel also agreed to take the following actions:

- pay wages, housing, and transportation costs, along with a per diem for those crew members that remain in the jurisdiction and facilitation of their travel for court appearances (*id.* §§ 2-3, 5c-d);

- encourage the crew to cooperate with the government's criminal investigation (*id.* § 2);

- maintain the employment of the crew members that remain in the jurisdiction (*id.*);

- arrange for repatriation of crew members once they leave the United States (*id.* § 3);

- hold the crew members' passports for safekeeping and notify the government if any crew member requests return of his passport (*id.* § 3);

- stipulate to the authenticity of documents and items seized from the vessel (*id.* § 8);

- help the government serve subpoenas on foreign crew members located outside of the United States (*id.* § 2);

- waive objections to both *in personam* and *in rem* jurisdiction (*id.* § 10); and

- enter an appearance in federal district court (*id.* § 11).

In addition, the agreement set forth the particular conditions under which the posted

surety bond would be paid out to the United States.  (*Id.* § 1.)  In short, the agreement

provided that the surety bond would be paid to the United States if the federal

government prevails in a subsequent prosecution and a judgment is entered against the Plaintiffs; otherwise, the full amount would be remitted to the payor. (*See id.*)

Unlike other vessel owners in similar circumstances who have filed emergency petitions in federal court while their ships are still detained, seeking to have a judge set the terms of release, *see, e.g.*, *Giuseppe Bottiglieri Shipping Co. S.P.A. v. United States*, 843 F. Supp. 2d 1241, 1242-43 (S.D. Ala. 2012), the Plaintiffs in the instant matter posted the bond amounts as the Coast Guard required and also executed the security agreements. (Compl. ¶¶ 21-22, 31-32, 41, 50-51; *see also* AR Agios Emilianos 000035; AR Gaurav Prem 000024; AR Polyneos 000016-17; AR Stellar Wind 000025.)[6] The Coast Guard then directed Customs to grant departure clearance to the vessels. (AR Agios Emilianos 000030; AR Gaurav Prem 000019; AR Polyneos 000011; AR Stellar Wind 000042.)

After the vessels were released, Plaintiffs initiated the Coast Guard's administrative appeals process in order to challenge the agency's requirement of the security agreements as a condition of release. (Compl. ¶¶ 71, 78, 83, 86, 89.) The Coast Guard's administrative appeal process has four stages: (1) a request for reconsideration at the Coast Guard Sector level; (2) appeal to the District Commander; (3) appeal to the Area Commander; and (4) appeal to the Coast Guard Assistant Commandant for Prevention. (*Id.* ¶¶ 71-76 (citing 46 C.F.R. § 1.03 and 33 C.F.R. § 160.7).) At the time Plaintiffs filed the instant complaint in federal court, all of Plaintiffs' requests for reconsideration (the first step in the appeals process) with

---

[6] The amount of the bond that was posted for each vessel varied: the Coast Guard required a monetary bond of $1,125,000 for both the Agios Emilianos and the Polyneos (Compl. ¶¶ 22, 51; AR Agios Emilianos 000032; AR Polyneos 000014); and $500,000 for the Stellar Wind and the Gaurav Prem (Compl. ¶¶ 32, 41; AR Stellar Wind 000023; AR Gaurav Prem 000022).

respect to each of the four vessels had been denied.  (*Id.* ¶¶ 78, 83, 86, 89.)  The administrative appeal for the Agios Emilianos was pending before the Area Commander (the third step in the procedure).  (*Id.* ¶ 81.)  And the appeals for the three other vessels were pending before the District Commander (the second step in the process).  (*Id.* ¶¶ 84, 87, 90.)  In the meantime, the Coast Guard moved forward with its criminal prosecutions, which ultimately resulted in pleas of guilty regarding various MARPOL violations and fines ranging from $300,000 to $2 million.  *See* Plea Agreement, *United States v. Ilios Shipping Co. S.A.*, Crim. Case No. 11-286 (E.D. La. Dec. 13, 2011), ECF No. 16 ($2,000,000 fine for the Agios Emilianos); Plea Agreement, *United States v. Target Ship Mgmt. PTE, Ltd.*, No. 11-cr-368 (S.D. Ala. May 29, 2012), ECF No. 249; Plea Agreement, *United States v. Odysea Carriers, S.A.*, Crim. No. 12-105 (E.D. La. March 8, 2012), ECF No. 18; *United States v. Cleopatra Shipping Agency, Ltd.*, Crim. No. 12-102 (M.D. La. Sept. 11, 2012), ECF No. 11.

Procedural History

Plaintiffs commenced this action on January 23, 2012.  The complaint contains only one count that is captioned "The Coast Guard Lacks [ ] Statutory Authority to Demand the Terms Extracted from the Plaintiffs in the Security Agreement."  (*See* Compl. at 27.)  In that count, Plaintiffs allege that "the Defendants purport to rely on the APPS, specifically 33 U.S.C. § 1908(e)[,]" as the basis for "demanding the terms in the Security Agreements," but that statute "does not authorize the Coast Guard to demand anything more than the posting of a bond **or** other financial surety in order to grant a vessel Customs clearance to depart the United States."  (*Id.* ¶¶ 108, 109 (emphasis in original).)  Consequently, according to the complaint, "[t]here is no

statutory basis or legal authority for the Defendants to demand . . . [the] fundamentally unfair and objectionable terms [of the Security Agreement] as a condition of releasing a vessel under 33 U.S.C. § 1908(e)." (*Id.* ¶ 111; *see also id.* ¶ 110 (asserting that "33 U.S.C. § 1908(e) neither requires nor authorizes the Defendants to condition release of the vessel upon the Plaintiffs agreeing to forfeit constitutionally protected rights, or assume any other financial obligations other than the obligation to post a bond or other monetary security to assure payment of any potential fine or penalty").)  Citing the APA, the complaint proceeds to allege that the Coast Guard used "economic coercion to force the Plaintiffs to accept the[ir] terms and conditions" (*id.* ¶ 112), and that the agency also improperly "require[d] the Plaintiffs to bear the costs of their own prosecution" without statutory authority to do so (*id.* ¶ 113), in manner that was "(A) arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law"; "(B) contrary to [their] constitutional right, power, privilege, or immunity"; and "(C) in excess of [the Coast Guard's] statutory jurisdiction, authority, or limitations, or short of statutory right." (*Id.* ¶¶ 112, 113, 114 (quoting 5 U.S.C. § 706 (internal quotation marks omitted) (alterations in complaint)).)  The complaint concludes with a request that, among other things, this Court both "[v]acate the Security Agreements forced upon the Plaintiffs by the Defendants as an arbitrary and capricious abuse of power" and "enjoin the Coast Guard from demanding anything more than a surety bond or other financial surety for the granting of a departure clearance for any vessel" detained for suspected violations of environmental law.  (*Id.* at 29.)

    In their motion for summary judgment, Defendants argue that the Coast Guard has complete discretion under section 1908(e) to choose the type of "surety" that is

required for the release of a detained vessel, and that this discretion extends to the

selection of a non-financial security agreement. (U.S. Mem. at 21.) Furthermore,

Defendants maintain that because the release determination is committed solely to

agency discretion by law, this Court lacks authority to consider Plaintiffs' challenge to

the conditions imposed here. (*Id.* at 18-21.) Plaintiffs have cross-moved for summary

judgment, conceding that there are no genuine issues of fact and seeking a ruling on the

legal questions underlying this matter. (Pls.' Mem. at 4 n.3.)

## DISCUSSION

The question before this Court at present is whether the Coast Guard exceeded

its statutory authority when it conditioned the release of Plaintiffs' vessels on the

posting of a bond and also the execution of security agreements that contained various

non-financial terms. As mentioned above, the relevant statutory provision states that

"[c]learance may be granted upon the filing of a bond or other surety satisfactory to the

Secretary" of the Department of Homeland Security. 33 U.S.C. § 1908(e). The

meaning of this provision is a question of first impression in the context presented here,

and as a threshold matter, Defendants vigorously maintain that the question must

remain unanswered because this Court does not have the authority to address it. In

Defendants' view, this Court cannot consider Plaintiffs' challenge to the Coast Guard's

practice of requiring non-financial security agreements because the agency's decision to

release detained vessels pursuant to section 1908(e) fits into the narrow category of

legal issues that are fully committed to agency discretion by law and are thus

effectively nonjusticiable. (U.S. Mem. at 18.) Consequently, before diving into the

merits of Plaintiffs' contention that Defendants have misinterpreted and misapplied the

statute, this Court must first evaluate whether the Coast Guard's action is reviewable. Only if that determination is answered in the affirmative can the Court proceed to consider Plaintiff's substantive arguments regarding the proper interpretation and application of section 1908(e).

## I.   LEGAL STANDARDS

### A.   Jurisdiction And Reviewability

The starting point for an evaluation of this Court's authority to review the claims in any complaint is confirmation that the Court has subject matter jurisdiction over the dispute. *See Loughlin v. United States*, 393 F.3d 155, 170 (D.C. Cir. 2004) ("[S]ubject matter jurisdiction is, of necessity, the first issue for an Article III court." (internal quotation marks and citation omitted)). The complaint alleges three alternative bases for subject matter jurisdiction—(1) 28 U.S.C. § 1331 (2014) (federal question); (2) 5 U.S.C. §§ 701-706 (APA); and (3) 28 U.S.C. § 1333 (admiralty jurisdiction). (*See* Compl. ¶ 11).[7] It is uncontested that this case at least presents a federal question regarding whether the Coast Guard has misinterpreted and misapplied the statutory provision that authorizes the detention and release of vessels, in violation of the APA. (*See* U.S. Mem. at 16 (acknowledging that Plaintiffs were "correct to rely on federal question jurisdiction" in this case).) Thus, the parties maintain, and this Court agrees, that the Court has subject matter jurisdiction over the instant dispute. *See* 28 U.S.C. § 1331; *see also Oryszak v. Sullivan*, 576 F.3d 522, 524-25 (D.C. Cir. 2009) (noting that

---

[7] Plaintiffs have conceded that jurisdiction based on a federal question and jurisdiction based upon the APA are one and the same, because jurisdiction for APA purposes is based on the underlying federal statute the agency is alleged to have violated; here, the APPS. (Pls.' Mem. at 11-12.) *See Oryszak v. Sullivan*, 576 F.3d 522, 524-25 (D.C. Cir. 2009) (jurisdiction does not stem from the APA, which is not a jurisdiction-conferring statute, but from the underlying federal question); *Gallucci v. Chao*, 374 F. Supp. 2d 121, 128 (D.C. Cir. 2005) (same) (citing *Califano v. Sanders*, 430 U.S. 99, 107 (1977)).

a district court will have subject matter jurisdiction over an APA claim pursuant to the "federal question" statute (citation omitted)); *see, e.g.*, *Sullivan v. Murphy*, 478 F.2d 938, 960 n.33 (D.C. Cir. 1973) (declining to address a second potential basis for jurisdiction having already found another).[8]

Significantly, the fact that this Court has subject matter jurisdiction over Plaintiffs' APA claim does not fully resolve the instant disagreement regarding whether this Court can review that claim. This is because the APA only provides a cause of action under limited circumstances, and regardless of the scope of the court's jurisdiction, a particular alleged violation of the APA may nevertheless be nonjusticiable. According to Black's Law Dictionary, a "justiciable" claim is one that is "properly brought before a court of justice" or "capable of being disposed of judicially[,]" *Black's Law Dictionary* 997 (10th ed. 2014), and a "nonjusticiable" claim is one that is "[n]ot proper for judicial determination[,]" *id.* at 1078. Accordingly, in this circuit, the justiciability issue is analyzed apart from jurisdiction, as a question of whether or not a claim is of the type that can be brought in federal court, rather than

---

[8] Notably, because the Coast Guard here required Plaintiffs to execute non-financial security agreements and the Plaintiffs did so, thereafter challenging the Coast Guard's requirements in a series of administrative appeals, the two well-established prerequisites to the Court's exercise of subject matter jurisdiction—final agency action and exhaustion of administrative remedies—have been met. These circumstances not only establish jurisdiction but also distinguish the instant case from similar departure-clearance cases that have been brought before other federal courts. Every other similar challenge to the departure clearance conditions imposed by the Coast Guard was brought *before* there was final agency action—*i.e.*, while the ships were still being detained—therefore, among other things, prior courts have concluded that such cases were not reviewable because there was no subject matter jurisdiction. *See, e.g.*, *Nimmrich & Prahm Reederei Gmbh & Co. KG MS Sonja v. United States*, 925 F. Supp. 2d 850, 855 (S.D. Tex. 2012) (finding no jurisdiction because, *inter alia*, there was no final agency action given that the Coast Guard had yet to impose release conditions and the plaintiffs sought the court's intervention in the ongoing negotiations between the parties); *Wilmina Shipping AS v. United States* (*Wilmina Shipping I*), 824 F. Supp. 2d 749, 751 (same); *see also* Order of Dismissal, *Lantra Shipping Ltd. v United States*, No. 4-11-cv-4637 (S.D. Tex. May 4, 2012), ECF No. 17 (granting voluntary dismissal under Federal Rule of Civil Procedure 41(a)(1) where the parties reached a settlement agreement regarding the conditions of release).

whether the federal court has jurisdiction to consider it.  *See Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011); *Oryszak*, 576 F.3d at 526.

As far as the justiciability of challenges to agency action is concerned, there is a statutory presumption in favor of judicial review of the decisions of administrative agencies.  *See* 5 U.S.C. § 704; *see also Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967).  However, the APA establishes two circumstances under which this reviewability presumption is overcome:  first, if the particular statute that the agency allegedly has violated expressly precludes judicial review, 5 U.S.C. § 701(a)(1), and second, if the challenged agency action concerns a matter that is otherwise "committed to agency discretion by law," *id.* § 701(a)(2); *see also Sierra Club*, 648 F.3d at 854-55. Defendants argue that the challenged action here concerns such a "committed" matter, and thus that Plaintiffs' claim is nonjusticiable under section 701(a)(2) of the APA. (U.S. Mem. at 19; U.S. Reply to Pls.' Resp. to its Mot. for Summ. J. ("U.S. Reply"), ECF No. 18, at 11.)  An examination of the circumstances under which courts have concluded that a matter is "committed to agency discretion by law" for the purpose of section 701(a)(2) is crucial to an understanding and evaluation of Defendant's non-justiciability argument.

### B.      The Meaning Of "Committed To Agency Discretion By Law"

It is well established that the exception set forth at section 701(a)(2) of the APA regarding matters that are "'committed to agency discretion by law' is a 'very narrow' one." *Hi-Tech Furnace Systs., Inc. v. FCC*, 224 F.3d 781, 788 (D.C. Cir. 2000) (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971)).  The Supreme Court has identified only two related scenarios in which this exception

applies:  (1) in "those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply[,]" *Overton Park*, 401 U.S. at 410 (internal quotation marks omitted); and (2) when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion[,]" *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).  "Agency actions in these circumstances are unreviewable because the courts have no legal norms pursuant to which to evaluate the challenged action, and thus no concrete limitations to impose on the agency's exercise of discretion."  *Sierra Club*, 648 F.3d at 855 (internal citation and quotation marks omitted).

Neither the D.C. Circuit nor any other court has previously decided whether the departure clearance conditions that the Coast Guard imposes under 33 U.S.C. § 1908(e) are "committed to agency discretion by law" in the precise context that has arisen here. All other courts that have addressed this statutory provision have done so under markedly different circumstances; that is, they have considered plaintiff vessel owners' emergency motions requesting that the court step into the shoes of Coast Guard officials and not only select the terms of the "bond or other surety" but also order the vessels' release.  *See supra* n.8*; see also, e.g.*, *Angelex Ltd. v. United States* (*Angelex II*), 723 F.3d 500, 503 (4th Cir. 2013); *Monarch Shipping Co., Ltd. v. United States*, No. 13-80661, 2013 WL 5741836, at *1 (S.D. Fla. Aug. 15, 2013); *Giuseppe Bottiglieri*, 843 F. Supp. 2d at 1246; Order, *First Bus. Shipping Corp. v. United States*, No. 06-cv-802, (M.D. Fla. June 14, 2006), ECF No. 8.  And even in those distinct circumstances, while considering the plaintiffs' emergency petitions, only two courts have reached the issue of justiciability.  *See Angelex Ltd. v. United States* (*Angelex II*), 723 F.3d at 502 (4th

Cir. 2013); *Giuseppe Bottiglieri Shipping Co. S.P.A. v. United States*, 843 F. Supp. 2d 1241, 1249 (S.D. Ala. 2012).  In both of these cases, the courts determined that review was precluded because setting the bond terms and ordering departure clearance are matters that are committed to agency discretion by law.  *See Angelex II*, 723 F.3d at 506 ("Because the action that occurred in this case is explicitly committed to the discretion of the Coast Guard pursuant to APPS, we conclude that this matter was unreviewable[.]" (reversing *Angelex Ltd. v. United States* (*Angelex I*), No. 2:13cv237, 2013 WL 1934490, at *1 (E.D. Va. May 8, 2013))); *see also Giuseppe Bottiglieri*, 843 F. Supp. 2d at 1249 ("Congress expressly afforded the Coast Guard virtually unfettered latitude to decide whether or not to grant clearance, and if so, what terms of 'bond or other surety' would be 'satisfactory' to it.").[9]

### 1.  The Fourth Circuit's Opinion In *Angelex*

The Fourth Circuit is, to date, the only court of appeals to have considered the justiciability of the conditions of departure clearance that the Coast Guard imposes under section 1908(e).  *Angelex* involved an emergency petition filed in the Eastern District of Virginia by a vessel (the Pappadakis, *in rem*) and its owner (Angelex Ltd. ("Angelex"), *in personam*) seeking immediate release of the vessel or, in the alternative, asking the district court to set the amount of bond appropriate for release. 723 F.3d at 503.  The Pappadakis had come to port at Norfolk, Virginia, and Coast Guard officers who boarded the ship for routine inspection found reason to believe that

---

[9]  Incidentally, both the Fourth Circuit, in *Angelex*, and the Southern District of Alabama, in *Giuseppe Bottiglieri*, collapsed the subject matter jurisdiction and reviewability questions into a single analysis. *See Angelex II*, 723 F.3d at 506; *Giuseppe Bottiglieri*, 843 F. Supp. 2d at 1249.  By contrast, as noted above, the D.C. Circuit requires that reviewability be addressed separate and apart from jurisdiction, *see Sierra Club*, 648 F.3d at 853, and also requires a searching assessment of the reviewability issue, as will be discussed more fully below.

the crew members had been operating the vessel in violation of MARPOL and the APPS because, among other things, the crew had failed to maintain an accurate oil record book. *Id.* The Coast Guard instructed Customs to withhold the Pappadakis's departure clearance pursuant to 33 U.S.C. § 1908(e), and the parties began negotiating what kind of "bond or other surety" would be required for the Pappadakis's release. *Id.* After several days of negotiating, the parties reached an impasse: the Coast Guard demanded a $2.5 million bond along with a security agreement containing various non-monetary obligations, and the vessel owner refused to comply with those conditions. *Id.*

The vessel owner then filed an emergency petition asking the federal district court to fix a lower bond amount than the parties had considered and to order the Coast Guard to release the vessel straight away upon the posting of that bond. *Id.* at 504. The government argued that the court lacked jurisdiction to review the Coast Guard's action because the agency's release terms were nonjusticiable. *See id.* Conflating jurisdiction and justiciability, the district court concluded that it had subject matter jurisdiction based on the APA because the matter was *not* committed to agency discretion by law, or in the alternative, because the court had *in rem* admiralty jurisdiction. *See Angelex I*, 2013 WL 1934490, at *6. Then, turning to the merits, the court concluded that section 1908(e) does not authorize the Coast Guard to impose anything other than non-monetary conditions for the release of a detained vessel. *Id.* at *9 (finding the Coast Guard's "attempt to impose additional non-monetary conditions" to be an action that exceeded the agency's statutory authority to impose a "bond or other surety" pursuant to 33 U.S.C. § 1908(e)). As a result of its legal conclusions, the district court entered an order that displaced the Coast Guard's required conditions for the release of the ship,

mandating that the ship be released upon the posting of only a $1.5 million bond.  *Id.* at
*10.

The Fourth Circuit reversed the district court's order.  With respect to the
amount of the bond, that court concluded that section 1908(e) "grants the Coast Guard
broad discretion to deny bond altogether, and [the Coast Guard] can dictate the terms of
any bond that it may accept."  *Angelex II*, 723 F.3d at 507 (citing *Giuseppe Bottiglieri*,
843 F. Supp. 2d at 1248).  The Fourth Circuit panel also determined that the statute did
not provide judicially manageable standards for evaluating the conditions of departure
clearance, given that there are no specific guidelines in the statute that direct the Coast
Guard when to grant clearance, nor are there guidelines pertaining to what form of
surety the Coast Guard should impose.  *Id.*  Explaining that "[t]he reasonableness of the
Coast Guard's decision cannot be determined pro forma in a vacuum, but only in the
context of the standards intended by Congress[,]" the Fourth Circuit concluded that this
is a situation where the statute provides no such standards such that there is no law to
apply.  *Id.* (citing *Chaney*, 470 U.S. at 830).

In *Giuseppe Bottiglieri*, a judge in the Southern District of Alabama similarly
found that the Coast Guard's clearance determination under section 1908(e) was
committed to agency discretion by law because there are no statutory standards to
apply.  843 F. Supp. 2d at 1248.  As the district court explained it, in enacting section
1908(e)

> Congress did not require the Coast Guard to accept a bond or other surety in any case.  It did not grant an absolute right to a vessel owner to obtain departure clearance.  It did not outline (even in the broadest brushstrokes) the parameters for what form or amount a bond or other surety should take.  It did not impose a reasonableness limitation on the bond or other surety fixed by the Coast Guard.  It did not even specify what a 'bond or other surety' is, or clearly bar the Coast Guard from including nonfinancial terms in [section] 1908(e) surety agreements.

*Id.* (footnote omitted).  Absent any standards to apply, the court concluded that the matter was committed to agency discretion by law.  *Id.* at 1249.

### 2.  The D.C. Circuit's Justiciability Jurisprudence

The Fourth Circuit's conclusion in *Angelex* and the judge's decision in *Giuseppe Bottiglieri* appear to be based on two primary considerations:  the fact that section 1908(e) grants discretion to the Secretary of DHS, and the apparent absence of meaningful guidelines within the statute itself regarding when departure clearance should be granted.  *See Angelex II*, 723 F.3d at 507-08.  In the D.C. Circuit, several additional factors are taken into account when a court considers whether or not a matter has been committed to agency discretion by law.  Courts evaluating justiciability under section 701(a)(2) of the APA in this jurisdiction consider a variety of factors that appear to fit into three general categories:  (1) "the nature of the administrative action at issue"; (2) "the language and structure of the statute that supplies the applicable legal standards for reviewing that action[,]" *Sierra Club*, 648 F.3d at 855 (internal quotation marks omitted) (quoting *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006)); and (3) Congress's intent to commit the matter fully to agency discretion as evidenced by, among other things, the statutory scheme, *see Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995).

The first consideration—the nature of the administrative action—refers to "certain categories of administrative decisions" that the Supreme Court and the D.C. Circuit consider presumptively unreviewable. *Twentymile Coal*, 456 F.3d at 156 & n.6 (collecting cases). For example, an agency's refusal to take enforcement action is, by its very nature, an unreviewable decision. *Chaney*, 470 U.S. at 831 (the FDA's decision not to institute enforcement actions to prevent use of drugs in lethal injections was, by its nature, committed to agency discretion by law); *Wayte v. United States*, 470 U.S. 598, 607 (1985) (the government's decision as to whom to prosecute criminally is unreviewable); *Twentymile Coal*, 456 F.3d at 157 (an agency's administrative charging decision is unreviewable); *Drake v. FAA*, 291 F.3d 59, 70-71 (D.C. Cir. 2002) (the agency's decision to dismiss an administrative complaint without a hearing was an unreviewable enforcement action). Likewise, it is established in this circuit that "executive branch decision[s] involving complicated foreign policy matters[,]" *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State* (*LAVAS*), 104 F.3d 1349, 1353 (D.C. Cir. 1997), or sensitive matters of national security, *see Oryszak*, 576 F.3d at 526, are nonjusticiable by nature.

The second consideration—the language and structure of the statute—involves applying typical canons of statutory construction to determine whether the statute provides standards for the agency to apply and for the courts to review. *See Delta Air Lines, Inc. v. Export-Import Bank of the U.S.*, 718 F.3d 974, 976-77 (D.C. Cir. 2013). In this regard, the court must first determine whether "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Chaney*, 470 U.S. at 830. Notably, the statute need not provide an

explicit list of particular standards; rather, so long as the court can infer some statutory benchmark by which to evaluate the agency's action, the action has not been committed to the agency as a matter of law and is thus subject to judicial review. *Cf. Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) ("Even when there are no clear statutory guidelines, courts often are still able to discern from the statutory scheme a congressional intention to pursue a general goal." (footnote omitted)).  In other words, the requirement of a "meaningful" statutory standard is just that:  "'a meaningful—not a rigorous, but neither a meaningless—standard against which to judge' the exercise of agency discretion." *Arent v. Shalala*, 70 F.3d 610, 614 (D.C. Cir 1995) (quoting *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 495 (D.C. Cir. 1988)).  And it is only "[i]f no 'judicially manageable standard' exists by which to judge the agency's action[ that] meaningful judicial review is impossible and the courts are [unable] to review that action." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003) (citing *Chaney*, 470 U.S. at 830).

The third and final consideration—whether the statutory scheme evidences Congress's intent to commit the matter totally to agency discretion—requires not only a deep dive into an evaluation of the language and structure of the statutory section at issue but also consideration of the function and purpose of the statute as a whole, looking for the following factors, among other things:  guidance or standards from other portions of the statute, *see Twentymile Coal*, 456 F.3d at 158-59; whether or not the statute provides alternative avenues for relief other than challenging the agency action in court, *see Inv. Co. Inst. v. FDIC*, 728 F.2d 518, 526 (D.C. Cir. 1984) (citation omitted); and whether "a deferential attitude on the part of Congress" toward the

agency's decision making in this area permeates the "overall structure" of the statute, *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1224 (D.C. Cir. 1993) (citing *Webster v. Doe*, 486 U.S. 592, 600 (1988)).  In addition, on the rare occasion when applying the plain text of the statute would lead to "absurd" results, courts may also consider the policy implications of the requested interpretation of the rule.  *Cook v. FDA*, 733 F.3d 1, 1 (D.C. Cir. 2013) (citing *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004)).  However, in conducting its review, a court must remember that the overall goal in this analysis is to determine whether the statutory scheme evinces Congress's intent to permit judicial review.  *See Toxco Inc. v. Chu*, 724 F. Supp. 2d 16, 23 (D.D.C. 2010) (collecting cases).

## II.    ANALYSIS

With this legal framework firmly in mind, this Court turns to a consideration of whether the conditions for release of a vessel that has been detained for suspected violations of international law pursuant to 33 U.S.C. § 1908(e) are committed to agency discretion by law.  Plaintiffs in this case argue that judicial review is appropriate because there is no indication in section 1908(e) that Congress "intend[ed] to bestow limitless discretion" upon the agency (Pls.' Mem. at 15), and that the instant case is readily distinguishable from *Angelex*—the lessons of which, according to Plaintiffs, are not easily transferrable.  (Pls.' Resp. to Defs.' Notice of Suppl. Authority ("Pls.' *Angelex II* Resp."), ECF No. 27, at 3.)  Defendants respond that the presumption in favor of judicial review is overcome in this case, just as it was in *Angelex*, because the language of section 1908(e) is highly discretionary, there is no meaningful law to apply, and the statutory scheme provides for an alternative remedy.  (U.S. Mem. at 19-21; U.S.

Reply at 4-8; *see also* U.S. Notice of Filing Suppl. Auth. ("U.S. *Angelex II* Notice"), ECF No. 26, at 2.)

As an initial matter, this Court concludes that the Fourth Circuit's non-binding analysis in *Angelex* should not be applied automatically to the instant dispute without further analysis for two reasons.  First, the Fourth Circuit did not engage in the extensive discussion of justiciability that is required in this jurisdiction.  *See Tonia Edwards v. District of Columbia*, No. 13-7064, 2014 WL 2895938 at *10 n.15 (D.C. Cir. June 27, 2014) (declining to credit other circuits' opinions where they "g[i]ve cursory treatment to[ ]significant legal issues" (citations omitted)).  Second, it is clear that the circumstances of *Angelex* are materially different from those in the case at bar.  Most notably, the plaintiffs in *Angelex* had asked the district court to order release of the vessel over the Coast Guard's objection as an emergency matter and while the vessel was still being detained.  *Angelex II*, 723 F.3d at 501.  The *Angelex* plaintiffs requested that the court itself set the terms of the applicable bond and grant release, *id.* at 503, which, in essence, was a request to bypass any exercise of Coast Guard discretion regarding release of the vessel.  By contrast, in this case, the Coast Guard has already exercised the discretion that it has under section 1908(e) to clear Plaintiffs' previously detained vessels, and Plaintiffs have asked this Court to review that exercise of discretion.  In other words, unlike *Angelex*, this Court is not being asked to make a decision that has been statutorily delegated to the Coast Guard (*i.e.*, whether the vessels should be cleared and under what circumstances); but instead, the Court is being asked to decide whether the Coast Guard acted within the scope of its statutory authority when the agency determined that the vessels should be released subject to certain conditions.

Consequently, this Court agrees with Plaintiffs that the findings and conclusions in *Angelex*—and in *Giuseppe Bottiglieri*, for that matter—"stand in stark contrast and are wholly inapplicable to the issue before the Court in this action[.]"  (Pls.' *Angelex II* Resp. at 3.)

Focusing now on the question of whether the Coast Guard's decision to release a detained vessel subject to non-financial conditions is a matter that is nonjusticiable because it has been "committed to agency discretion by law" as that legal issue is analyzed in this jurisdiction, this Court begins its evaluation where the D.C. Circuit instructs:  with the nature of the administrative action.  *See Sierra Club*, 648 F.3d at 855.  The Court will then examine the plain language and structure of the statute and the relevant policy considerations related to Congress's intent.  *See id.*; *see also Totten*, 380 F.3d at 494.  As explained below, this Court concludes that the matter of the Coast Guard's action under section 1908(e) is committed to agency discretion by law and, therefore, is unreviewable.

### A.   The Coast Guard's Clearance Conditions Are Not Nonjusticiable By Nature

The Coast Guard's discretionary decision regarding whether to grant departure clearance, and under what conditions it is willing to do so, is unlike other agency decisions that have been held to be unreviewable by nature under 5 U.S.C. § 701(a)(2).  An agency's decision not to commence an enforcement action is the quintessential type of matter that courts have determined to be wholly within the agency's discretion, *see, e.g.*, *Chaney*, 470 U.S. at 830; *Twentymile Coal*, 456 F.3d at 157; *Drake*, 291 F.3d at 70-71, and if the challenged determination here related to the Coast Guard's decision to initiate prosecution (or not) with respect to the suspected violations of the APPS, the

agency's discretionary act would very likely fall into this category. But Plaintiffs here are not challenging the Coast Guard's decision to enforce international environmental law and thereby detain the vessels in order to investigate and potentially prosecute the vessels' crewmembers for APPS violations. Nor have Plaintiffs asked this Court to review the Coast Guard's decision to grant or deny departure clearance altogether—a decision that perhaps sounds in foreign policy and could potentially fit into the category of matters that are presumptively committed to agency discretion because they might be deemed to relate to sensitive agency determinations relating to foreign relations or national security. *See LAVAS*, 104 F.3d at 1353; *Webster*, 486 U.S. at 600; *Oryszak*, 576 F.3d at 526.

In short, this Court cannot conclude that, by its nature, the Coast Guard's decision regarding the amount of "bond or other surety" or other release conditions—a decision that is clearly ancillary to the exercise of the agency's core discretionary decision to enforce MARPOL—fits into the category of matters that are "committed to agency discretion by law" under the APA and thus not subject to review.

### B.    The Language Of Section 1908(e) Provides Insufficient Standards For The Court To Apply

Under D.C. Circuit precedent, this Court's finding that Plaintiffs' action is not nonjusticiable by its nature does not end the matter: the Court must also consider whether the language and structure of section 1908(e) nevertheless clearly evidence a legislative intent to "restrict access to judicial review." *Mistick PBT v. Chao*, 440 F.3d 503, 509 (D.C. Cir. 2006) (internal quotation marks and citations omitted). As previously noted, section 1908(e) states that, after departure clearance is revoked for a suspected violation of the APPS, "[c]learance may be granted upon the filing of a bond

or other surety satisfactory to the Secretary." 33 U.S.C. § 1908(e).  There is no dispute that the discretion to choose the "bond or other surety" and to grant departure clearance is broad, and Defendants insist that this broadly-worded grant of authority is sufficient to defeat Plaintiffs' contention that judicial review is appropriate.  (*See* U.S. Mem. at 25; U.S. Reply at 4.)  But the D.C. Circuit has made clear that a grant of broad discretion in a statute, through permissive language or otherwise, does not necessarily mean there are no standards for the court to apply.  *See Amador Cnty., Cal. v. Salazar*, 640 F.3d 373, 381 (D.C. Cir. 2011); *Dickson*, 68 F.3d at 1401-04; *Envtl. Def. Fund v. Hardin*, 428 F.2d 1093, 1098 (D.C. Cir. 1970).  To the contrary, so long as the statute sets forth some limitations on the agency's discretion, however slight, judicial review is available.  *See, e.g.*, *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007) (finding sufficient standards to apply where the agency's discretion to provide services was limited by the requirement that it provide "high quality and cost-effective" care); *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001) (finding sufficient standards to apply where the agency's discretion was limited by the requirement that the decision be supported by "satisfactory proof").

Here, because section 1908(e) states in no uncertain terms that "[c]learance may be granted *upon the filing of a bond or other surety satisfactory to the Secretary*[,]" 33 U.S.C. § 1908(e) (emphasis added), Defendants maintain that Congress surely meant for the agency to have complete discretion when choosing the "bond or other surety" that would be required for release.  (*See* U.S. Reply. at 4.)  Focusing on that same language, Plaintiffs insist that Congress inserted "other surety" precisely to provide a meaningful standard for judicial review of the Coast Guard's conditions, and that based on this

plain language, the required release conditions must be *financial* terms, and also that

only *one* such surety can be required because the "or" in "bond or other surety" must be

given its ordinary disjunctive meaning.  (*See* Pls.' Mem. at 20-21.)

If the only indicia of Congress's intent regarding the scope of the agency's

discretion to release a detained vessel was the phrase "bond or other surety satisfactory

to the Secretary[,]" this Court would likely agree with Plaintiffs' interpretation of the

statute.  There is substantial support for the proposition that "surety" is used nearly

exclusively in financial contexts; indeed, the established definition of that term, as well

as other references to that term through the U.S. Code and the Code of Federal

Regulations, strongly suggest that a "surety" ordinarily is limited to a financial

obligation.[10]  What is more, Congress's use of the term "or" must be construed in

accordance with its ordinary disjunctive meaning, and thus, with respect to section

---

[10] For example, a "surety" is principally defined as a person "who is primarily liable for paying of another's debt or performing another's obligation[,]" or as a "formal assurance; esp., a pledge, bond, guarantee, or security given for the fulfillment of an undertaking[,]" and a "surety bond" as a bond normally issued by a bank and that is "given by a surety to ensure the timely performance of a contract[,]" usually in an amount that is some percentage of the value that is owed.  *Black's Law Dictionary* 1617, 1670-71 (10th ed. 2014); *see also* Oxford English Dictionary Online (defining "surety" as a "formal engagement entered into, a pledge, bond, guarantee, or security given for the fulfillment of an undertaking[,]" or a "document embodying such an agreement or pledge").  Similarly, references to a "surety" throughout the U.S. Code and Code of Federal Regulations contain additional language that reflects the word's financial meaning.  *See, e.g.*, 12 C.F.R. § 1010.10(c)(3) (to obtain financing, a developer must post a "bond or other surety . . . in the full amount of the cost" of a certain project); 24 C.F.R. § 1710 (same).  Likewise, the historical use of the word "surety" over centuries of jurisprudence confirms the word's financial underpinnings.  *See, e.g.*, *Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 140-41 (1962) (discussing sureties' ability to indemnify themselves against losses); *Newton v. Consol. Gas Co. of N.Y.*, 265 U.S. 78, 86 (1924) ("Congress has made elaborate provision for the safe use of surety companies as security upon bonds required in court and other proceedings[.]"); *United States v. Reynolds*, 235 U.S. 133, 144 (1914) (discussing debt owed to a surety); *Ross v. Jones*, 89 U.S. 576, 591 (1874) ("Persons, bound as security for another, . . . includes sureties proper in a bond, bill, or note[.]" (internal quotation marks omitted)); *Olney v. Arnold*, 3 U.S. 308, 311 n.3 (1796) (a petitioner shall "giv[e] bond in the said office with one sufficient surety, in such sum as he, the secretary, considering the nature of such suit or executions shall think meet" certain conditions).  Plaintiffs also persuasively point out that the bond provision in section 1908(e) is based not on any particular provision of MARPOL, but rather on language in the United Nations Convention on the Law of the Sea, *see* U.N. Convention on the Law of the Sea ("UNCLOS"), 1833 U.N.T.S. 397 (entered into force Nov. 16, 1994), which specifically notes that "release shall be made promptly subject to reasonable procedures such as bonding *or other appropriate financial security*."  (*See* Pls.' Suppl. Reply at 9 (emphasis in original) (quoting UNCLOS).)

1908(e), the "or" generally evidences Congress's intent to have the Secretary choose one type of financial condition among the range of similar options. *See In re Espy*, 80 F.3d 501, 505 (D.C. Cir. 1996) (noting that "a statute written in the disjunctive is generally construed as 'setting out separate and distinct alternatives'" (citation omitted)); *United States v. Moore*, 613 F.2d 1029, 1039 (D.C. Cir. 1979) ("Normally, of course, 'or' is to be accepted for its disjunctive connotation, and not as a word interchangeable with 'and.'" (footnote omitted)).  The plain meaning of "surety" and its disjunctive relationship with "bond" in section 1908(e) are meaningful standards that would certainly inform the Court's determination of the permissibility of the Coast Guard's interpretation of "bond or other surety" to permit the imposition of a bond and also non-financial conditions of release *if* that phrase was the *only* statutory language that related to the Coast Guard's challenged departure clearance determination.  But unfortunately for Plaintiffs, such is not the case.  That is, even assuming that Plaintiffs are correct that, by its terms, the statute establishes that the only "bond or other surety" that the Secretary can find satisfactory as a condition of release is a *financial* surety, the statute nevertheless appears to permit the Coast Guard to deny departure clearance altogether, or to require some additional conditions before making the clearance decision, and *that*, in this Court's estimation, is the Achilles heel of Plaintiffs' otherwise well-reasoned argument.

Specifically, the text of section 1908(e) plainly establishes that Congress has vested the agency with the authority to make at least *two* discretionary judgment calls: what "bond or other surety" will be deemed satisfactory as a condition of departure clearance, and also whether or not to release the vessel.  Put another way, by virtue of

section 1908(e)'s use of the term "may" in the statement "[c]learance *may* be granted upon the filing of a bond or other surety satisfactory to the Secretary[,]" the statute evidences no congressional intent to *require* the agency to release the vessel even if a satisfactory "bond or other surety" is posted.  Instead, Congress appears to have made the "bond or other surety" a necessary but not sufficient prerequisite for departure clearance after a vessel is detained under section 1908(e), and the statute provides no standards for a court to use to determine whether the agency has improperly continued to withhold clearance even after the "bond or other surety" condition is satisfied.

This statutory interpretation is inescapable for two reasons.  First, in the earlier clause of section 1908(e), Congress uses the term "shall" with respect to the agency's revocation of departure clearance, which means that Congress knew full well how to require agency action, and its subsequent use of the term "may" with respect to the matter of vessel release strongly indicates that the question of release remains within the Coast Guard's discretion even once the bond is posted.  Second, and even more important, the statute and its attendant regulations are devoid of any other limits, requirements, or criteria that provide any guideposts by which a court can measure the Coast Guard's discretionary decision to continue to withhold departure clearance after the owner has provided a bond (or other surety).  *See Overton Park*, 401 U.S. at 410; *Chaney*, 470 U.S. at 830; *Sierra Club*, 648 F.3d at 855.  To be sure, as stated above and as Plaintiffs point out (*see, e.g.*, Pls.' Mem. in Resp. to the Court's Minute Order Dated Apr. 25, 2014, Requesting Suppl. Briefing ("Pls.' Suppl. Br."), ECF No. 31, at 5-6), the D.C. Circuit has repeatedly emphasized that the word "may" in a statute does not, in and of itself, mean that the matter is committed to agency discretion by law.  But the

Circuit has also held that where, as here, "may" is coupled with "absolutely no guidance" as to how the agency should exercise that discretion, *Robbins*, 780 F.2d at 45, the matter has been committed to agency discretion by law.

### C.   The Overall Structure Of The APPS, Viewed In The Context Of Other Pronouncements About The Government's Authority To Grant Or Deny Departure Clearance, Supports Non-Justiciability

The structure of the APPS provides further support for the conclusion that the matter of what conditions may be required for the release of a vessel detained for suspected violations of international environmental law is "committed to agency discretion" for the purpose of 5 U.S.C. § 701(a)(2).  First of all, the APPS provides the Coast Guard with discretion not only to withhold departure clearance but also to engage in a variety of measures to investigate and prosecute suspected MARPOL violations. *See e.g.*, 33 U.S.C. § 1908(e), 1903 (granting discretion to the Secretary to "administer and enforce" MARPOL), 1907(a) (stating that the agency "shall use all appropriate and practical measures" to detect environmental law violations and "shall establish adequate procedures" to investigate them), 1904(a) (granting the agency discretion to designate persons who may issue required certificates under MARPOL).  The breadth of the authorized tools that the Coast Guard can bring to bear on the problem, and the fact that the agency has discretion to use any and all of them, demonstrates Congress's recognition of the Coast Guard's particular expertise when it comes to investigating and prosecuting such violations.  *See Webster*, 486 U.S. at 600; *Marshall Cnty.*, 988 F.2d at 1224.  In addition, the APPS also provides an alternative avenue for relief for unwarranted detention of a vessel—an action for compensation for unlawful detention, *see* 33 U.S.C. § 1904; *see also Wilmina Shipping AS v. United States* (*Wilmina Shipping*

*I*), 824 F. Supp. 2d 749, 753 (S.D. Tex. 2010).  This is further evidence that Congress

did not intend for there to be judicial review of the Coast Guard's decision to withhold

departure clearance under the APA.  *See Inv. Co. Inst.*, 728 F.2d at 526 (noting that the

existence of alternative avenues for relief weighs against judicial review under the

APA).

It is also clear beyond cavil that, by mandating that departure clearance be

revoked for suspected APPS violations, section 1908(e) implicates the statutory and

regulatory scheme that governs the Coast Guard's authority to order Customs to grant

or deny departure clearance in any event, and under that scheme, the Coast Guard

appears to have complete discretion.  Plaintiffs have not cited, and the Court has not

found, any statute or regulation that requires the Coast Guard to order Customs to

release a detained vessel when certain criteria are met.  This absence of standards

governing when the Coast Guard must order Customs to release a vessel stands in stark

contrast to the statutes and regulations that apply to Customs exercise of its own

departure clearance authority.  Section 60105 of Title 46 of the United States Code

provides that all foreign-flagged ships must obtain clearance from Customs before

departing a U.S. port, and authorizes Customs to prescribe regulations that govern the

"manner in which clearance under this section is to be obtained, including the

documents, data, or information" required, 46 U.S.C. § 60105(b)-(c), which Customs

has done, *see* 19 C.F.R. § 4.61 (2014).  Consequently, there are clear standards that

govern Customs' decision to withhold clearance, and that agency's clearance

determinations have been held to be reviewable.  *See Hendricks v. Gonzalez*, 67 F. 351,

353 (2d Cir. 1895) (noting that, in the absence of some other statutory authority,

Customs must grant departure clearance when the required documentation is submitted unless there is other statutory authority to withhold clearance). However, the same cannot be said of the *Coast Guard*'s decision to order Customs to grant or continue to withhold departure clearance once it has ordered that clearance be denied upon suspicion of a violation of the APPS or any other statute. The fact that the statutory and regulatory scheme establishes standards that govern Customs' exercise of discretion to grant or deny departure clearance, but there are no such standards in place to govern the Coast Guard's decision regarding whether to order Customs to release a vessel detained pursuant to section 1908, is an additional reason to conclude that Congress intended to commit fully to the Coast Guard the matter of whether and under what circumstances Plaintiffs' vessels must have been released.

### D. Plaintiffs' Arguments In Support Of Reviewability Fail

Plaintiffs vigorously resist the conclusion that a court cannot review the matter of the conditions to be imposed for the clearance of a vessel detained pursuant to section 1908(e) for a number of reasons. First, Plaintiffs contend that, under the plain terms of the statute, "the discretion granted [to] the Coast Guard through the use of the word 'may[ ]' is limited to determining the quantum of the bond or other financial surety the Coast Guard may require[.]" (Pls.' Suppl. Br. at 6 (footnote omitted).) But this interpretation of section 1908(e) would clearly render the word "may" superfluous, given that the phrase "satisfactory to the Secretary" already reflects the Coast Guard's discretion to fix the amount of the bond or other surety. Consequently, it is inconsistent with the canon of statutory interpretation that requires that a statute be construed "so that no provision is rendered inoperative or superfluous, void or insignificant." *Laurel*

*Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 472 (D.C. Cir. 2009)

(internal quotation marks omitted) (quoting *Asiana Airlines v. FAA*, 134 F.3d 393, 398

(D.C. Cir. 1998)); *see also Corley v. United States*, 556 U.S. 303, 314 (noting that "one

of the most basic interpretative canons" is that a "statute should be construed so that

effect is given to all its provisions" (internal quotation marks and citation omitted)).

Thus, contrary to Plaintiffs' position, the word "may" must reflect a grant of agency

discretion *beyond* the discretion that is already clearly associated with the agency's

determination of the amount of "bond or other surety."

Next, Plaintiffs contend that the purpose of the statutory requirement of a bond is

to "ensure" vessel owners' participation in the litigation, which leads Plaintiffs to

reason that the challenged non-financial conditions in the Coast Guard's security

agreements—which are designed to accomplish that same end—are not necessary, and

thus Congress must not have intended for the agency to have the authority to require

such conditions in addition to a bond.  (*See* Pls.' Suppl. Reply at 6-7 (asserting that the

Coast Guard has discretion to "determin[e] the quantum of the bond or other financial

surety the Coast Guard may require *to ensure* payment of any fine or civil penalties that

might [ ] eventually be incurred" and that "[o]nce the bond or other financial surety is

posted, the statutory language does not authorize the Coast Guard or any other

governmental agency to continue to refuse to grant clearance to the vessel" (emphasis

in original)).)  This argument lacks persuasive force because the language of the

security agreements at issue here, as well as the legislative history of section 1908(e)

and the practices that are actually used in the prosecution of criminal cases related to

the vessels, establish that the purpose of the bond is to *assure* an eventual judgment *if*

*the government wins its case* against suspected violators, not to "ensure" a suspect's participation in the prosecution of the case against him.

The distinction between "ensure" and "assure" is as subtle as it is important: nothing in section 1908(e) or its legislative history suggests that Congress intended for the bond or other surety to ensure participation in the APPS prosecution because, with respect to the surety bonds that vessel owners post, the government is not entitled to retain the bond amount unless it proves its case. *Compare with* 18 U.S.C. § 3142(b) (2014) (authorizing the pretrial release of a person "upon execution of an unsecured appearance bond"). A surety bond such as the one at issue here is unlike a bail bond insofar as a surety bond is posted to assure—or guarantee—that the money is available to pay a fine or penalty in the event that the government wins a judgment, not to ensure that a suspect returns to participate in the prosecution proceedings.[11] This is undoubtedly why Congress inserted the word "surety" into section 1908(e), and it is also why the House Report that accompanied that statute's enactment explained that section 1908(e)'s purpose was "to *assure* payment of any fine or civil penalties that might be incurred upon completion of criminal proceedings or civil penalty actions[.]" H.R. Rep. No. 96-1224, at 17 (1980), *reprinted in* 1980 U.S.C.C.A.N. 4849, 4864 (emphasis added). And, indeed, the particular language of the challenged security agreements here echo this sentiment, making clear both that the government is only entitled to keep the posted bond money if it wins a judgment in court, and also that the full amount of the bond must be remitted to the Plaintiffs if the government does not win its case. (*See, e.g.*, Appendix §§ 1a, 1b (providing that "[i]f judgment is entered in

---

[11] *See* Gertrude Block, *Making Sure We Understand 'Insure,' 'Ensure' and 'Assure,'* 34 DEC Pa. Lawyer 58 (2012).

favor of" Plaintiffs, "the Surety Bond shall be returned[.]"), 1c-e (defining the

circumstances in which all or part of the surety bond must be remitted to the

owner/operators of the vessels).)  Consequently, this Court finds unpersuasive

Plaintiffs' argument that because the bond ensures a suspected violator's participation

in any subsequent prosecution proceedings, the Coast Guard should not be deemed to

have discretion to withhold departure clearance in order to require execution of a

security agreement once a bond is posted.

The Court also rejects Plaintiffs' contention that the Coast Guard's policy

manuals and a variety of secondary sources establish that the agency must release a

vessel immediately upon the execution of a bond or other surety and cannot proceed to

require the execution of security agreements or anything else.  In support of this

argument, Plaintiffs chiefly rely on a number of internal Coast Guard policy manuals

that describe the procedures the agency should follow when it detains foreign-flagged

vessels in United States ports.  (*See* Pls.' Suppl. Reply at 10-14.)[12]  But policy

documents do not have the force of law.  *See Christensen v. Harris Cnty.*, 529 U.S. 576,

587 (2000) (noting that "policy statements, agency manuals, and enforcement

guidelines" all "lack the force of law"); *Jolly v. Listerman*, 672 F.2d 935, 940-41 (D.C.

Cir. 1982) (noting that "not every piece of paper emanating from" an agency is a

binding rule, particularly where the language is more "informative" than "directive or

---

[12] Among the policy documents that Plaintiffs cite are the Coast Guard Guidance Report on Vessel Inspection, U.S. Coast Guard Navigation & Vessel Inspection Circular (NVIC) No. 06-03, Change 2, Coast Guard Port State Control Targeting and Examination Policy for Vessel Security and Safety, *available at* http://www.uscg.mil/hq/cg5/nvic/pdf/2003/NAVIC06_03_ch2.pdf; the Coast Guard Marine Safety Manual, COMDTINST M16000.7A, Volume I at 4-7, *available at* http://www.uscg.mil/directives/cim/16000-16999/CIM_16000_6.pdf; and the Coast Guard Policy Guidance on Criminal Enforcement.  (*See* U.S. Coast Guard Commandant Instruction, COMDTINST M16201.1, Criminal Enforcement of Environmental Laws, 3-3 (July 30, 1997), Ex. A to Pl.'s Suppl. Br., ECF No. 31-1, at 2.)

mandatory" (citation omitted)). And even so, the directives in such documents cannot be interpreted in a manner that is inconsistent with the plain language of the governing statute.

Even if the Coast Guard's manuals and internal policy statements constituted binding law, a careful reading of the cited sources reveals that none of them actually states that the Coast Guard *must* release a vessel once a bond or other surety is posted, or conversely, that the Coast Guard lacks discretion to deny clearance after a financial security has been received.  For example, one such document provides that, if "allegations exist that a vessel has violated certain U.S. safety and pollution laws, the Coast Guard may request that [Customs] deny or withhold the required clearance from the vessel until the vessel posts a letter of undertaking or surety bond." *See* U.S. Coast Guard Navigation & Vessel Inspection Circular (NVIC), No. 06-03, Change 2, Coast Guard Port State Control Targeting and Examination Policy for Vessel Security and Safety, at 104.[13]  This is not a mandate that the only clearance requirement the Coast Guard can demand is the posting of a bond.  Similarly, another policy statement notes that the Coast Guard may withhold clearance "pending the filing with the Coast Guard of a bond or other surety satisfactory to the Coast Guard[,]" but does not speak to whether the grant clearance is mandatory once the bond is filed.  (*See* Coast Guard Policy Guidance on Criminal Enforcement, U.S. Coast Guard Commandant Instruction, COMDTINST M16201.1, Criminal Enforcement of Environmental Laws (July 30, 1997), Ex. A to Pls.' Suppl. Br., ECF No. 31-1, at 2.)

To be sure, there is some indication in the cited materials that it is the Coast Guard's usual practice to grant clearance once a bond or other surety is posted, and in

---

[13] *Available at* http://www.uscg.mil/hq/cg5/nvic/pdf/2003/NAVIC06_03_ch2.pdf.

some of its guidance, the agency specifically notes that "[departure] clearance withholding is not a general enforcement tool."  U.S. Coast Guard Marine Safety Manual, COMDTINST M16000, Volume V, at C1-13.[14]  But the agency's policy pronouncements also typically state that the Coast Guard "retains discretion to deviate from or change this guidance without notice," *id.* at A1-4, which means that any quick-clearance policy may not pertain in all circumstances, and given the fact that the Coast Guard regulates departure clearance in a variety of contexts outside of investigating and enforcing MARPOL and APPS violations, including mere civil penalty scenarios, such flexibility is clearly warranted.  *See, e.g.*, 33 U.S.C. § 2716 (2014) (the Coast Guard may detain a vessel subject to a civil penalty under the Clean Water Act); 16 U.S.C. 1376 (2014) (the Coast Guard may detain a vessel subject to a civil penalty under the Marine Mammal Protection Act "until such penalty is paid, or until a bond or otherwise satisfactory surety is posted"); 46 U.S.C. § 2110 (2014) (the Coast Guard shall detain a vessel that has an unpaid shipping fee or other charge "until the fee or charge is paid or until a bond is posted for the payment").  Thus, the cited manuals and materials do not conclusively establish that the Coast Guard retains no discretion to withhold departure clearance after the posting of a bond in the instant circumstances.

Nor do the secondary sources that Plaintiffs cite—at least one of which is authored by one of the attorneys who has appeared as counsel in this case— unambiguously maintain that the Coast Guard *must* grant clearance to a vessel as soon as a bond or other financial surety is posted when the vessel has been detained under section 1908(e).  For example, one cited article notes that vessel owners "may avoid" being detained for suspected APPS violations "by posting a bond in an amount

---

[14] *Available at* http://www.uscg.mil/directives/cim/16000-16999/CIM_16000_10A.pdf.

satisfactory to the Secretary."  James B. Nelson, *Alternative Sentencing Under the MARPOL Protocol: Using Polluters' Fines to Fund Environmental Restoration*, 10 Hastings W.-N.W. J. Envtl. L. & Pol'y 1, 6-7 (Fall 2003).  But the article neither states explicitly nor provides any support for the proposition that the Coast Guard *must* provide clearance once the bond is posted—it simply repeats the statutory mandate that a bond is a necessary perquisite to release.  *See id.*  Likewise, a second source only contends—as do Plaintiffs—that the bond provision in the APPS stems from the United Nations Convention on the Law of the Sea ("UNCLOS"), an international treaty that provides that, once departure clearance is withheld, "release shall be made promptly subject to reasonable procedures such as bonding or other appropriate financial security[,]" and that signatory countries "shall not delay a foreign vessel longer than is essential for purposes of the investigations[.]"  Lt. Benedict S. Gullo, *The Illegal Discharge of Oil on the High Seas: The U.S. Coast Guard's Ongoing Battle Against Vessel Polluters and a New Approach Towards Establishing Environmental Compliance*, 209 Mil. L. Rev. 122, 142 n.164 (Fall 2011) (quoting UNCLOS Art. 226(1)(b)).  Of course, the Coast Guard's argument here is that the challenged security agreements are "essential" to its investigation and prosecution of suspected MARPOL violations (*see* U.S. Suppl. Br. at 16), which means that the UNCLOS statement is not inconsistent with the conclusion that Congress intended for the Coast Guard to have discretion to determine that a vessel needs to be detained in order to facilitate its criminal investigation.[15]

---

[15] The other secondary articles on this subject that this Court has found fare no better when it comes to providing support for Plaintiffs' position.  In fact, most of them merely lament the Coast Guard's broad discretion to determine when granting departure clearance is appropriate once it has been revoked and advocate for the position that Plaintiffs here seek to advance.  *See* Katriel Statman, *"To Comply or Not*

Plaintiffs' final argument against interpreting section 1908(e) to confer upon the Coast Guard complete discretion over the conditions of release is that adopting this reading would lead to untenable results.  Specifically, according to Plaintiffs, a finding that the Coast Guard's requirement of non-financial security agreements is nonjusticiable would leave the agency with "unchallengeable authority to demand *any* terms and conditions it so desires in exchange for the granting of a [departure] clearance."  (Pls.' Reply in Supp. of Cross-Mot. for Summ. J. ("Pls.' Reply"), ECF No. 21, at 11 (emphasis in original).)  Plaintiffs' fear of this outcome is unfounded, as is their suggestion that the security agreements at issue here involved such untenable terms, for two basic reasons.

First, there is nothing to prevent a court from considering *constitutional* challenges to the Coast Guard's departure clearance demands, *see Webster*, 486 U.S. at 603-04, and judicial review of a constitutional due process claim that challenges unconscionable clearance conditions would prevent absurd results.  *See Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006) (noting that a substantive due process violation occurs if the government's conduct is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" (citation omitted)).  Defendants even concede this point.  (*See* U.S. Reply at 7 (noting that Defendants do "not argue that no court could ever review the Coast Guard's

---

to Comply?" An Argument In Favor of Increasing Investigation And Enforcement of MARPOL Annex I Violations, 5 Wash. & Lee J. Energy, Climate, & Env't 251 (2013); Michael G. Chalos, Wayne A. Parker, *The Criminalization of Maritime Accidents and Marpol Violations in the United States*, 23 U.S.F. Mar. L.J. 206, 211 (2011); Bruce Pasfield, Jocelyn A. Steiner, *Crew Detention: What Can A Ship Owner Can Do?*, 38 J. Mar. L. & Com. 215, 217 (2007).

security demands").[16]  Thus, a finding that this Court can review Plaintiffs' APA claim is not necessary in order to avoid the agency overreach that Plaintiffs fear.

Second, and perhaps even more important, Plaintiffs' repeated suggestion that a court must be able to review (and reject) the Coast Guard's required security agreements because the terms of those contracts are unfair, arbitrary, and unjustified (*see, e.g.*, Pls.' Reply at 15-16) minimizes the fact that, unlike other ships subject to the departure clearance process, the crew aboard Plaintiffs' vessels were suspected of serious violations of international and environmental law.  If the posting of a bond was all that the Coast Guard had discretion to require before it must grant departure clearance when a vessel's crew is suspected of having falsified records to conceal the dumping of oil into international waters, then the people who staff, own, and operate cargo vessels could effectively avoid liability for APPS violations with impunity—by simply posting a surety bond and then sailing away—and in so doing, prevent the U.S. government from effectively investigating and prosecuting their offenses.  Surely that result was not what Congress intended when it enacted a comprehensive statutory scheme that makes MARPOL violations a federal crime and thus seeks to hold violators of international and environmental law accountable for their actions.

To the contrary, section 1908(e) reads as if Congress intended only to make clear to federal authorities that, *if* a vessel that is suspected of APPS violations was going to be released after being mandatorily detained for investigation of that serious crime, the owners of the vessel should at least be required to post a satisfactory bond.  This

---

[16] Notably, as explained at the outset, the instant complaint contains only one claim that is based solely on the Plaintiffs' contention that the Coast Guard has violated the APA in various respects—including that the agency's actions were "contrary to [a] constitutional right, power, privilege, or immunity" of the Plaintiffs (*see* Compl. ¶¶ 102, 113 (quoting 5 U.S.C. § 706(2)(B)); consequently, Plaintiffs have not stated a claim directly under any constitutional provision.

admonition in the statute does not suggest an intent to require federal authorities to release a suspect vessel in any event; and indeed, there is nothing in the statute that would prevent the Coast Guard from refusing to accept any bond at all and detaining a ship throughout the course of the agency's investigation and any subsequent prosecution.  Plaintiffs' insistence that section 1908(e) should be read to mean that the Coast Guard *must* release a ship suspected of violating the APPS if a bond is posted without requiring anything more—and more to the point, that this Court can review and overturn the Coast Guard's decision to withhold departure clearance unless and until other release conditions are met—is inconsistent with Congress's clear intent (as manifest in the text, structure and purpose of the APPS) that the APPS be effectively enforced and that federal authorities be given broad discretion to do so.

## CONCLUSION

To summarize, Plaintiffs' arguments all fall short of convincing this Court that the broad discretion that section 1908(e) confers upon the Coast Guard to withhold departure clearance is limited in any respect.  Rather, this Court concludes that the statutory text, structure, and purpose of the APPS all confirm that Congress placed the question of whether, and under what circumstances, departure clearance is to be granted under section 1908(e) entirely within the Coast Guard's discretion.  Put another way, even if Plaintiffs are correct that a bond or other *financial* surety is a necessary prerequisite of the exercise of the Coast Guard's departure clearance authority under section 1908(e), that statute makes clear that the Coast Guard "may" release the vessel upon the posting of such a bond, and does not provide any standards for this Court to apply when evaluating the Coast Guard's decision not to grant departure clearance even

if a bond is posted without satisfaction of other conditions.  And this lack of any statutory standard by which to assess the circumstances under which the agency may (or may not) grant departure clearance for the purpose of section 1908(e) means that this clearance matter is "committed to agency discretion by law."  *See Delta Air Lines*, 718 F.3d at 976-77.  Consequently, as set forth in the separate order entered concurrently with this opinion, Defendants' motion for summary judgment is **GRANTED**, and Plaintiffs' cross-motion for summary judgment is **DENIED**.

Date:  July 18, 2014                                    *Ketanji Brown Jackson*
                                                         KETANJI BROWN JACKSON
                                                         United States District Judge

# APPENDIX

## AGREEMENT ON SECURITY

## RECITALS

A.      WATERVALE MARINE CO. LTD. ("Owner"), a corporation formed pursuant to the laws of Cyprus with offices at John Kennedy Street, Iris House Office 740B, Limassol, Cyprus, was at all relevant times the registered owner of the M/V AGIOS EMILIANOS (IMO # 8802935) ("the Vessel").

B.      ILIOS SHIPPING CO S.A. ("Operator"), a Greece-domiciled company with offices at 41, Akti Miaouli, 185 35 Piraeus, Greece, was at all relevant times the operator of the Vessel under applicable United States law.

C.      The United States of America ("United States") asserts that the Vessel is subject to the MARPOL Protocol 73/78, the Act to Prevent Pollution from Ships ("APPS"), and the Clean Water Act ("CWA"); that the Vessel violated MARPOL Protocol 73/78, APPS, 33 U.S.C. § 1901 et seq., and the regulations thereunder, and the Clean Water Act 33 U.S.C. § 1251 et seq. (collectively, the "Alleged Violations"); and that a U.S. District Court may assess criminal penalties against the Vessel *in rem* or its Owner and/or Operator *in personam*.

D.      The United States, pursuant to a request from Captain of the Port Sector New Orleans on April 27, 2011, is withholding the Vessel's U.S. Customs and Border Protection ("CBP") departure clearance until the Vessel provides security as authorized by 33 U.S.C. § 1908(e).

E.      The Owner, Operator, and the United States, as parties to this Agreement, desire to arrange for security to be posted to secure the performance of this Agreement and to permit CBP to issue the Vessel's departure clearance.

## AGREEMENT

This Agreement in its entirety constitutes surety satisfactory to the Secretary of Homeland Security ("Secretary") per 33 U.S.C. § 1908(e).  As consideration for surety satisfactory to the Secretary for the release of the Vessel, the undersigned parties agree as follows:

1.  Owner and Operator shall post a Surety Bond in the amount of $1,125,000 United States Dollars (USD), as security for any adjudicated potential fines or penalties for the offenses mentioned above and to ensure performance of this Agreement.  The Surety Bond shall be posted prior to the Vessel's departure from New Orleans, Louisiana, and delivered to the U.S. Coast Guard, to the attention of Lieutenant Commander Angela Holbrook, Commander (dl), Eighth Coast Guard District, 500 Poydras Street, Suite 1311, New Orleans, LA 70130.  When the U.S. Coast Guard receives the Surety Bond, and upon receipt of an executed copy of this document, the U.S. Coast Guard will promptly notify U.S. Customs that departure clearance of the Vessel may be granted as it relates to the violations alleged in the U.S. Coast Guard's letter to the Master of the Vessel dated April 27, 2011.  The Surety Bond shall be paid out to the United States as provided for in the Surety Bond and as follows:

   a.  Subject to any right of appeal, if a penalty is assessed by a United States court or authorized administrative body in a civil, criminal, or administrative action against the vessel *in rem* or its Owner or Operator *in personam* for violation of the Act to Prevent Pollution from Ships (APPS) (33 U.S.C. §1901 et seq.), and/or the Clean Water Act (33 U.S.C. §1251 et seq.), then the net amount of such penalty (or the full amount of the Surety Bond, if the penalty

A-2

is in excess of the Surety Bond) shall be paid to the United States as directed by the Court.  The balance amount of the Surety Bond remaining in excess of the amount paid to the United States shall be remitted to Owner and/or Operator.

b. If judgment is entered in favor of Owner and Operator in a criminal or civil action, the Surety Bond shall be returned to the Owner and/or Operator.

c. If either the Owner and/or Operator fail to appear as required by this Agreement, or fail to waive objections to jurisdiction as required by this Agreement, then the amount of the Surety Bond shall be paid to the United States.

d. If a United States court renders a finding that either the Owner or Operator materially breached any obligation contained in this Agreement, then such amount of the Surety Bond, as directed by the court, shall be payable to the United States in reimbursement for actual expenses required for performance of the aforementioned obligations by the United States[.]

e. If a full or partial plea agreement or compromise is reached in a civil, criminal, or administrative action, then payment shall be made in accordance with joint written instructions from the United States and Owner and Operator, and the unused portion of the original surety bond shall be promptly returned to the Owner and Operator.

Any dispute between the United States and Owner or Operator regarding this agreement shall be submitted to the United States court which hears the criminal action.  In any such dispute wherein one party claims a breach of the terms and conditions herein, the

party asserting that there has been a breach of the Agreement shall bear the burden of proof.

2.   Owner and Operator agree to facilitate interviews of any officer or crewmember employed by Owner or Operator, to the extent reasonably feasible at the time such a request is made by the United States.  Owner and Operator agree to cooperate with the United States to arrange for testimony of such employed officer or crewmember before a Grand Jury or other judicial or administrative proceeding arising from the Alleged Violations.  Owner and Operator agree to assist the United States in effecting proper service of process related to the Alleged Violations for such employed officer or crewmember who is not in the United States at the time the subpoena is issued, in a manner consistent with U.S. laws and the laws of the foreign country where the individuals are located.  To the extent permitted by the limitation set out in paragraphs 6 and 7, the Owner and Operator will encourage these officers and crewmembers to cooperate with the United States in carrying out its investigation and in appearing for their scheduled testimony.  Owner and Operator will act in good faith in carrying out these obligations.  No disciplinary measures or legal proceedings or any other retaliatory actions will be instituted by the Owner and/or Operator or any agent of the Owner and/or Operator of the Vessel against any officer or crewmember or other employee as a result of the officer's or crewmember's or other employee's cooperation with the United States.  No efforts will be undertaken to retaliate against the officers or crewmembers or other employees for their cooperation, either now or at any time in the future, and the Owner and Operator will make reasonable efforts to prevent third parties from [ ] doing the same.  The United States agrees that it will provide reasonable notice

A-4

of its need for these officers and crewmembers to be present so that Owner and Operator may arrange for substitute officers and crewmembers.

   3.  At the request of the U.S. Coast Guard acting on behalf of the United States, the following ship's officers and crewmembers will remain within [ ] the jurisdiction of the U.S. District Court – Eastern District of Louisiana

   1) MISLANG, Valentino – Master;

   2) ESPERAS, Romulo – Chief Engineer;

   3) MAGBANUA, Allan – Second Engineer;

   4) LUGA, Renato – Third Engineer;

   5) DAQUIOAG, Oscar – Fourth Engineer;

   6) DACILLO, Armandito – Electrician;

   7) CAMACHO, Noel – Oiler;

   8) MONDEGA, Nelson – Oiler;

   9) PADASAY, Roy – Oiler;

   10) RABENA, Rodolfo – Oiler.

The Owner and Operator agree to provide reasonable lodging, a meal allowance of $60.00 USD per day, and health care coverage to the aforementioned ship's officers and crewmembers of the Vessel while in the United States, regardless of the current employment status of the aforementioned ship's officers and crewmembers, until the United States, through its attorney responsible for the pending criminal investigation, advises that their presence is no longer necessary.  The Owner and Operator are on notice that the Travelodge/Travel Best Inn in Kenner, Louisiana is not considered "reasonable lodging" under this section.

Owner and Operator agree to immediately notify the United States, through both its attorney responsible for the pending criminal investigation, as well as Lieutenant Commander Angela Holbrook, of the name, address and telephone number of the hotel where each ship's officer and crewmember resides.

The U.S. Coast Guard, in conjunction with the U.S. Customs and Border Protection, will process, as expeditiously as possible, the necessary paperwork to grant immigration status necessary to enable the aforementioned ship's officers and crewmembers to remain in the United States for the duration of the Security Agreement. Should the Vessel depart prior to the aforementioned ship's officers and crewmembers being granted immigration status necessary to enable them to remain in the United States commensurate with the duration of this Agreement, the Owner and Operator are on notice that U.S. Customs and Border Protection may impose additional requirements for these officers and crewmembers. The "duration of this Agreement" is defined as "when all criminal trials arising from and related to the facts of this case have been completed." Owner and Operator agree that no such ship's officer or crewmember will be allowed to remain aboard the Vessel when it departs from the United States unless the United States, through its attorney responsible for the pending criminal investigation, advises Owner and/or Operator that the ship's officer or crewmember may leave the United States aboard the Vessel. Owner and Operator agree to continue to employ and to pay total wages in a timely manner and in a manner consistent with any applicable collective bargaining agreements or employee contracts until the United States, through its attorney responsible for the pending criminal investigation, advises that their presence is no longer necessary. "Total wages" as used in this paragraph

includes the total wage the crewmember contracted for and anticipated, including guaranteed overtime.  Additionally, the payment of wages shall continue even in the event that the normal employment contract for the employee may otherwise or ordinarily expire.

After being advised by the United States, through its attorney responsible for the pending criminal investigation, that the presence of an aforementioned ship's officer or crewmember is no longer necessary, Owner and Operator will repatriate the ship's officer or crewmember to his home country, or to another port so that the ship's officer or crewmember may complete his employment contract, unless otherwise agreed or ordered by a court of competent jurisdiction.  The requirements of the Owner and Operator set forth in this paragraph shall continue until the case (or cases) is (are) declined, go to trial, or depositions are taken in accordance with Rules of Criminal Procedure[ ], Rule 15, after an indictment or information has been returned.  Owner and Operator will act in good faith in carrying out these obligations.

4.      The United States and the Owner and Operator agree to take reasonable measures to expedite the investigation of the Alleged Violations and any subsequent proceedings.  If Owner and/or Operator have grounds to believe that the investigation or any subsequent proceedings are being unreasonably and significantly delayed, then after notifying the U.S. Coast Guard signatory to this Agreement of the basis for their position in writing, and allowing ten (10) business days for a response, they may seek judicial review by the U.S. District Court – Eastern District of Louisiana[.]

5.      The United States agrees that the Owner and Operator cannot exercise complete control over the ship's officers and crewmembers of the Vessel and therefore

Owner's and Operator's obligations in respect to ensuring any ship's officer or crewmember of the Vessel remains within or returns to the jurisdictions of the U.S. District Court – Eastern District of Louisiana, shall be limited to:

a.      requesting such ship's officers and crewmembers of the Vessel to surrender their passports to the Owner and Operator for safe keeping;

b.      requesting such ship's officers and crewmembers of the Vessel to remain within the jurisdiction of the U.S. District Court – Eastern District of Louisiana[;]

c.      providing such ship's officers and crewmembers of the Vessel with reasonable lodging, a meal allowance and health care coverage as provided in this Agreement; and

d.      providing such ship's officers and crewmembers of the Vessel with transportation to all places of testimony and all meetings with attorneys from the Department of Justice, and will accommodate reasonable request to provide transportation to meetings with law enforcement agents when alternate transportation arrangements cannot be made.

If such a ship's officer or crewmember refuses to surrender his passport to Owner or Operator, then Owner and Operator shall immediately provide actual notice to the United States, through both its attorney responsible for the pending criminal investigation as well as Lieutenant Commander Angela Holbrook.  If at any time any such ship's Officer or crewmember requests the return of his passport by Owner and/or Operator, then Owner and/or Operator shall provide actual notice to the United States, through both its attorney responsible for the pending criminal investigation, as well as Lieutenant Commander Angela Holbrook, at least seventy-two (72) hours before

A-8

returning the passport to the ship's officer or crewmember.  Regarding such ship's officers and crewmembers of the Vessel, Owner and Operator shall have no further responsibility or obligations to the U.S. Coast Guard other than those stated herein, except as otherwise provided by law or regulation.

6.      The obligations of the Owner and Operator set forth herein with respect to the specifically aforementioned ship's officers and crewmembers of the Vessel are subject to all rights of each ship's officer and crewmember as may be asserted by the ship's officer or crewmember or by any attorney working on his behalf.

7.      Nothing in this Agreement is to be deemed as binding on non-parties to this Agreement.  In particular, for each ship's officer and crewmember who may be served with a federal Grand Jury, Rule 15 deposition, or trial subpoena or material witness warrant and who is required to remain within the jurisdictions of the U.S. District Court – Eastern District of Louisiana, their rights pursuant to 18 U.S.C. § 3144, F. R. Crim. P. Rule 15 and other federal laws are specifically preserved.

8.      The United States has previously provided an inventory of all documents, copies of documents, or items seized from the Vessel.  Owner and Operator agree to stipulate to the authenticity of documents listed on the inventory provided by the United States after the Owner and Operator, through counsel, have had a reasonable opportunity to review the inventory and compare it against actual documents referenced in the inventory.  The United States agrees that by so stipulating, Owner and Operator do not waive any objections they may have to the relevance or admissibility of the documents into evidence in any proceeding, or to the manner in which they were seized and removed, or to any other matter concerning the documents except their authenticity

at the time of their seizure.  Owner and Operator also agree to reasonably facilitate and assist the United States in effecting service of federal Grand Jury, deposition, and/or trial subpoenas to records custodians employed by the Owner and Operator and who are not in the United States at the time the subpoena is issued.  The Owner and Operator will instruct records custodians to cooperate with the United States in carrying out its investigation and will act in good faith in carrying out this obligation.

9.      Owner, Operator and the United States agree that the criminal and civil penalty claims of the United States against the Vessel *in rem* shall attach to the Vessel release's security as provided pursuant to the Federal Rules of Civil Procedure, Admiralty, Maritime Claims, Supplemental Rule E(5).  In consideration of the Surety Bond, the United States agrees not to cause the arrest of the Vessel, nor the arrest, seizure or attachment of any other vessel owned, operated, managed, or chartered by the Owner or Operator, and not to withhold [Customs] departure clearance of the Vessel, or any other vessel under the same management and control of the Owner and Operator, on account of the Alleged Violations in the U.S. Coast Guard's letter to the Master of the Vessel dated April 27, 2011.

10.      This Agreement is to be binding whether the Vessel be in port or not in port, lost or not lost, and regardless of its condition, and is given without prejudice as to all rights or defenses which the Vessel, Owner and/or Operator may have, none of which is to be regarded as waived, except the Owner and Operator agree to waive any objections to *in personam* jurisdiction over them, and *in rem* jurisdiction over the Vessel, with respect to the potential claims of the United States described above, in the United States court which hears the criminal action.

11.     Owner and Operator authorize Michael Chalos and/or Brian McCarthy of Chalos, O'Connor, and Duffy, LLP, as agents of Owner/Operator for this Agreement, to accept service of any correspondence or legal papers relating to the Alleged Violations on behalf of the Vessel, Owner and Operator at its offices at 366 Main Street, Port Washington, New York 11050.  The Owner and Operator agree to enter an appearance in  any criminal action brought against them in a United States court concerning the Alleged Violations, or in any civil penalty action brought against them in any other forum, and to defend the Vessel from any *in rem* criminal claim asserted against it.

12.     The United States and Owner and Operator enter into this Agreement without prejudice as to all rights or defenses, none of which is to be regarded as waived except as expressly set forth above.

13.     This Agreement may be signed in duplicate originals.


Dated: May 7, 2011                    WATERVALE MARINE CO. LTD.
                                      As Owner, M/V AGIOS EMILIANOS

                                      _____/s/_____
                                      By:    Michael Chalos
                                             Chalos, O'Connor, and Duffy, LLP

                                      As attorney in fact per authority received May 7, 2011


Dated:  May 7, 2011:                  ILIOS SHIPPING CO, S.A.
                                      As Operator, M/V AGIOS EMILIANOS

                                      _____/s/_____
                                      By:    Michael Chalos
                                             Chalos, O'Connor, and Duffy, LLP

                                      As attorney in fact per authority received May 7, 2011

Dated:  May 9, 2011                    United States of America

                                       _____/s/_____
                                       By:    Scott C. Herman
                                              Lieutenant Commander, U.S. Coast Guard
                                              Deputy Staff Judge Advocate
                                              Eighth Coast Guard District